12096

MOORE *ET AL.* v. ATLANTIC COAST LINE R. CO. *ET AL.*

(135 S. E., 473)

1. RAILROADS.—Testimony that other trains had set out fire at same place *held* admissible, in absence of showing of difference in conditions impairing inference from evidence.

2. PRINCIPAL AND AGENT.—Agency may be shown by circumstantial evidence.

3. EVIDENCE—SUBORNATION OF WITNESS BY PARTY TO SUIT IS ADMISSIBLE AS EVIDENCE TENDING TO SHOW FALSITY OR FRAUDULENT NATURE OF CLAIM.—Subornation of witness by party to suit, or attempt to do so, is admissible as evidence tending to establish falsity or fraudulent nature of his claim, on theory that it tends to show such party's consciousness of weakness or injustice to his cause

4. EVIDENCE.—In view of circumstances showing agency of one attempting to bribe witnesses, testimony by such witnesses of attempt *held* admissible.

5. TRIAL—COUNSEL'S ADMISSION THAT HE HAD NOT CHARGED PLAINTIFF WITH ATTEMPT TO BRIBE WITNESS HELD NOT INTENDED AS AGREEMENT THAT TESTIMONY OF WITNESS SOUGHT TO BE BRIBED WAS INCOMPETENT.—Admission by counsel that he had not charged plaintiff with attempt to bribe witnesses, and that he had not been connected with it, *held* not intended as waiver or agreement that testimony of witnesses sought to be bribed was incompetent.

6. ATTORNEY AND CLIENT.—Attorneys engaged in cause are generally to be held to understand, and bound by statements made to Court.

Before FEATHERSTONE, J., Barnwell, September, 1923. Reversed and remanded for a new trial.

Action by B. S. Moore and another against the Atlantic Coast Line Railroad Company and another. Judgment for plaintiffs, and defendants appeal.

*Messrs. Douglas McKay* and *Harley & Blatt,* for appellants, cite: *Evidence of defects in locomotives other than the one doing the injury inadmissible:* 87 S. C., 180; 90 Ga., 663; 35 A. S. R., 232; 144 Pa. St., 461; 27 A. S. R., 652; 98 Pa. St., 316. *Evidence insufficient to sustain verdict:* 125 S. C., 1; 99 S. C., 417.

*Messrs. J. O. Patterson, Jr.,* and *Brown & Bush,* for respondents, cite: *Communication of fire by locomotive suf-*

*ficient to raise presumption of negligence:* 81 S. C., 81. *Operation of locomotive setting out fire at speed in excess of ordinance is negligence per se:* 108 S. C., 131. *Admissibility of evidence of other fires communicated by other locomotives under similar circumstances:* 87 S. C., 179; 47 L. Ed., 1057; 23 L. Ed., 562. *Proof by circumstantial evidence that locomotive set out fire:* 115 S. C., 500; 99 S. C., 498; 47 L. Ed., 1057. *Evidence sufficient to sustain verdict:* 115 S. C., 500; 99 S. C., 498; 96 S. C., 154; 84 S. C., 299. *Proof of agency:* 68 S. C., 363; 21 R. C. L., 821.

November 3, 1926.

The opinion of the Court was delivered by MR. JUSTICE BLEASE.

The appeal in this cause was heard at the November session, 1925, of this Court. Hon. J. H. Marion, former Associate Justice, as an Acting Associate Justice, delivered· the opinion of the Court, which reversed the judgment below and remanded the cause for a new trial. Hon. R. C. Watts and Hon. T. P. Cothran, Associate Justices, and Hon. R. O. Purdy, Acting Associate Justice, concurred in the opinion.

A petition for a rehearing on the part of the respondents was duly filed, and a majority of the Justices, who heard the cause, thought that the petition should be granted, and an order to that effect was accordingly passed.

The opinion of the Acting Associate Justice Marion was as follows:

"In an action for the recovery of damages on account of the loss of a ginnery building and contents, alleged to have been caused by fire communicated by one of the defendant railroad's locomotive engines, operated by the defendant Boone, the plaintiffs recovered a verdict against both defendants. From judgment thereon the defendants appealed upon four exceptions, one of which (Exception 1) was abandoned at the hearing. The points raised by the three remaining exceptions will be considered in order.

"The first of these (Exception 2) is that the trial Court erred in permitting Ben Hughes, a witness for the plaintiff, and B. S. Moore, one of the plaintiffs, to testify over objection 'that other trains had set out, fire at the same place.' This assignment error is based upon the contentions that there was no testimony 'tending to show that the engine or engines were of the same class and equipped as the train in question was on the night of the fire,' and that in the absence of such testimony the evidence objected to was irrelevant and inadmissible. For reasons which will be briefly indicated, we think appellants' position is untenable. The relevancy of this class of testimony— that is, the probative force of similar acts or events— which is predicated upon the theory that in the natural world similar causes produce like results, 'is a resultant of three main factors: (1) The extent of the similarity; (2) the observed regularity of action; (3) the presence or absence of modifying forces.' 22 C. J., 742, § 933. For the reason that even where the conditions under which two events occurred are apparently similar, or as to certain of the conditions, are in fact identical, the absence of a former element or the presence of a new factor in a physical combination of causes may suffice to produce a very different result, the use of such evidence always entails the danger of its weight being overestimated and its importance exaggerated by the jury. For that reason, and others having to do with the pratical inconvenience of trying a number of collateral issues at the same time, 'the rule is that it is within the discretion of the Court, except under special circumstances, to reject evidence of former acts or occurrences as proof that a particular act was done or a certain occurrence happened.' 22 C. J., 741, § 834. *McClintock v. Charleston & W. C. Railway,* 83 S. C., 58; 64 S. E., 1009. In a case like that at bar, however, that 'evidence of other fires communicated by other locomotives of the defendant company, under similar conditions and at or near the same time, is admis-

sible as tending to show a probability that the fire under investigation was set out in the same way,' is expressly recognized and ruled in our case of *McGill Bros. v. Railway*, 87 S. C., 178; 69 S. E., 156. But in that case the Court (Mr. Justice Woods) points out and illustrates the necessity for the preliminary showing of substantial identity or essential similarity in the conditions of the two fires, in which connection the observation is made 'that the changes in the construction and the fixtures of locomotive engines are frequent, and hence it would not be fair to infer that an engine in use to-day probably set out fire because engines in use twelve months before had done so.' But the point here involved is not ruled by that observation—the soundness of which we are not disposed to question. In this case there was some evidence tending to refute the basic premise of fact upon which plaintiffs rested their case, viz., the physical possibility of 'live' sparks, capable of setting out the fire in question, being carried from engines on the tracks of the defendant railroad company to the premises where the fire occurred. Thus, it appeared that the ginnery, a frame structure, covered with corrugated iron, was not on the railroad's right of way; that between the railroad track and the ginnery there was a brick warehouse and a wooden seedhouse; and that when the fire in the ginnery was discovered there was no fire burning between the track and the ginnery. The testimony of Hughes and Moore was to the effect that within a period of three months before this fire they had observed freight trains on the defendants railroad company's line pass the ginnery at night, emitting sparks, and that on certain occasions they had put out fire from these sparks on the ginnery property. It was plaintiffs' contention that this particular fire had been set out by a certain freight train which passed the ginnery during the nighttime, emitting sparks, about a half hour before the fire was discovered. The testimony of Hughes and Moore, therefore, tended to rebut any inference that live sparks could

not be carried from passing engines to plaintiff's premises and related to occurrences as to which the conditions as to place and distance were substantially identical and the conditions as to manner of emission and character of the sparks, substantially similar. In the absence of any evidential showing that there were differences in the conditions—such, for example, as differences in the weather conditions—which would impair or destroy the force of any inference reasonably to be drawn from this testimony, upon the issue as to the origin of the fire under investigation, we cannot say that in the admission of this testimony the trial Court's discretion was erroneously exercised. Exception 2 is, therefore, overruled.

"The appellants' second contention (Exception 3) is that the trial Court erred in excluding the testimony of defendants' witnesses, Baxley and Creech, to the effect that one Gary Owens had attempted to bribe them to give certain testimony on behalf of the plaintiffs on the trial of this cause. The question presented cannot be fairly disposed of without a somewhat extended reference to the proceedings at the trial and to the evidential facts.

"For the purpose of having the Court pass on the admissibility of the testimony offered, defendants' counsel requested that the jury be permitted to retire from the court-room. That request having been granted, the defendants offered and the Court excluded this testimony, which, stated in narrative form, was in substance as follows:

"Lonnie Baxley: In May of this year just before this case was to be tried, Gary Owens and Lige Collins came out to see me one Sunday afternoon. I have just got in and did not hear any of the testimony this morning. Mr. Collins is a painter here in town. My wife and his wife are sisters. He (Gary Owens) and Mr. Collins tried to get me to testify that I left his (Collin's) house on the night of the fire, and that I went out by the Atlantic Coast Line depot, and that there was a train coming through, and that the fire-

man was shoveling coal, and that I went on a little further, and that I looked back and saw the fire taking place. He (Gary Owens) said he was going to have his hands testify that they were hunting that night and that they stopped there and saw it, and that they went on and saw the fire when they looked back. They offered me $75.00 to do that.

"Josh Creech: 'I am a son of the ex-coroner here. Gary Owens, with Lige Collins, saw me and talked with me in the presence of Mr. Baxley one Sunday afternoon. He asked me if I was not at my sister's that night of the burning. My sister is Mrs. Lige Collins here in town. He asked me if I didn't pass Mr. Moore's gin, and that the train passed, and that the sparks were flying out, and that if I didn't go on a piece and see the ginhouse on fire. He wanted me to testify that and offered me $75.00 to testify that. He made that same statement to Mr. Baxley. I didn't come to Court and they didn't subpœna me. I got advice from older people whether or not to testify. The party I talked with told me no man ought to testify to a lie for money. I fire a skidder and get $1.50 per day.'

"Lonnie Baxley, recalled: 'Mr. Gary Owens did not say that anybody sent him to me, but he talked like he had an interest in the suit. He said he was to have an interest in the suit if he would go and get the witnesses. He did not say Mr. Moore sent him. I run a skidder. Before that fired at the sawmill about six six miles from here.'

"After the foregoing testimony had been offered, and 'after the jury had gone to view the scene of the fire,' the following occurred:

" 'Mr. Brown: I understand, if the Court please, that these two men that made the statements awhile ago are in Court and would like to testify. I understand that they say now that the statements they made were not true, but that some of the railroad people got them to come up here and say that.

" 'The Court: Let them come up here.

" 'Lonnie Baxley, recalled to the stand:

" 'Questions by the Court:

" 'Q. The statements you made awhile ago when you were on the witness stand—were they true? A. Yes, sir.

" 'Q. Did anybody on behalf· of the railroad company offer to bribe you if you would make that statement? A. Mr. Gary Owens and Lige Collins offered me $75.00 if I would make that statement.

" 'Q. Did anybody on behalf of the railroad company offer to pay you any money? A. No, sir; they did not.

" 'Josh Creech, recalled to the stand:

" 'Questions by the Court:

" 'Q. Did you tell the truth awhile ago? A. Yes, sir.

" 'Q. Did anybody offer to pay you to come here and testify in this case? A. Lige Collins offered me, but Mr. Gary Owens did not.

" 'Q. Was Mr. Gary Owens talking to you out there awhile ago? A. Yes, sir.

" 'Q. What did he say to you? A. He said he made no offer when he was at my house of what he would give me.

" 'Q. Did anybody on behalf of the railroad offer to pay you any money? A. No, sir.

" 'Q. Who offered you money? A. Lige Collins.

" 'The Court (to Mr. Lonnie Baxley) : Mr. Baxley, did Collins offer to pay you money, too?

" 'Lonnie Baxley: No, sir; Mr. Gary Owens offered to pay me money to come here and testify.

" 'The Court: I am going to instruct the Solicitor of this Circuit to institute proceedings against these two men, and have them indicted for interfering with the administration of justice; and if I had known that you were trying to interfere with those witnesses awhile ago, I would have slapped you in jail before you knew it, but I am going to instruct the Solicitor to take this matter up. Mr. Stenographer, I instruct you to submit this testimony or a

copy of it to the Solicitor of this Circuit with instructions from the Court to investigate it and institute proceedings against these two men.'

"In the development of their case in chief, the plaintiffs had offered and introduced the testimony of John Hogg, Sam Brown, and Doc Owens, to the effect that they were out hunting the night of the fire; that they saw a freight train of the defendant railroad company pass Mr. Moore's ginhouse; that as it passed it was putting out sparks; that the fire box was open and a man was punching up the fire; that the train was running very fast; that the sparks were being carried by the wind toward Mr. Moore's ginhouse; and that about a half hour afterward one of them heard the fire alarm.

"On cross-examination one of these witnesses, John Hogg, testified as follows:

" 'Q. You worked for Mr. Gary Owens?  A. Yes, sir.

" 'Q. Did he ever talk with you about it?  A. Me and Sam and some of them were talking about it under the shed one day, and he walked up.

" 'Q. How long after the fire was it?  A. Two or three days, and he asked me about it.

" 'Q. He came up and asked you about it?  A. Yes, sir.

" 'Q. That is Mr. Gary Owens you are talking about? A. Yes, sir.

" 'Q. Mr. Gary Owens works for Mr. Moore in the gin now?  A. He worked there last week.

" 'Q. He works there now?  A. I don't know.

" 'Q. He has worked before for Mr. Moore, hasn't he? A. I don't know.

" 'Me and Mr. Doc Owens and Sam were there working and talking, and Mr. Gary came up there. Doc Owens is Mr. Gary Owens' brother. He was with us on the hunting trip. Joe Ree was also with us. He works for Mr. Gary Owens' father. We didn't stop talking when Mr. Gary Owens came up, because it was no secret. Mr. Gary Owens

brought us to Mr. Patterson's office to see him. We were talking to ourselves when Mr. Gary Owens came up to where we were under the shed and heard it. I don't know whether he told Mr. Moore. All I know is he came and got me. I don't know how Mr. Moore and Mr. Patterson got hold of it. I did not talk with Mr. Moore about it until I had talked with Mr. Gary Owens. Mr. Moore never did call my attention to it. Mr. Doc Owens talked with me about this fire and what I saw. I don't know how long it was after I had the conversation with Mr. Doc Owens before Mr. Gary Owens saw me. After that I came up to Mr. Patterson's office. Doc Owens was there. Sam Brown was there. He works for Mr. Gary Owens, too. Joe Ree was also there. He works for Mr. Gary Owens' father. That comprised the crowd that was out hunting that night.'

"Another of these witnesses, Doc Owens, testified as follows: 'I heard about the fire the next morning, and I was talking it that I was out hunting that night. I told Mr. Evans, who works for the railroad company, about it, and he sent a detective down there. I told the detective that I just knew about the 12 o'clock train coming. I told the detective in the presence of Mr. Evans that I did not know anything about it. I did that because Mr. Moore asked me not to say anything about it.'

"Cross-Examination by Mr. Harley: 'Mr. Evans sent for me, and there was a railroad man with him, and I told him the only train I heard was the 12 o'clock train. I didn't tell him about the other train because Mr. Moore asked me not to tell him. After Mr. Moore asked me not to do that, I told the detective an untruth. It was in the presence of Mr. Evans about a week afterwards. Right after the fire they tried to get me to testify for the railroad, and I told him that I would not make a statement, but that the only train I saw coming through was the 12 o'clock passenger train. I knew that I was telling an untruth. Mr. Moore was running a transfer, and he was out there at the depot

22—S. C. 137

that morning and heard me tell Mr. Evans, and Mr. Moore asked me not to say anything about it. Mr. Moore is a good friend of mine, and asked me not to make a statement against him or in favor of the railroad company. I told a story on account of my friendship with Mr. Moore. After Mr. Moore told me not to say anything about it, Gary Owens carried me to Mr. Patterson's office and told me not to talk it, and I didn't say anything more about it. Ott Evans is one of the agents here, and he and my brother married sisters. Mr. Evans was in the depot with me when I made the statement to the detective, and I never did go to Mr. Evans and tell him that the statement I made was a lie. I kept it a secret. These Negroes that were with me all worked on my father's place or on Gary's place. I was with these Negroes when they stopped in the road and saw this freight train coming and throwing out the sparks, but I told the detective afterwards that I didn't know anything about it. I don't guess it would have been any harm to have gone ahead and told him the truth, but Mr. Moore asked me not to say anything about it. The dogs we had on that hunt belonged to my brother, Gary Owens. We hunted for coons and 'possums. I don't remember whether we caught anything on that hunt or not.'

"In the light of the foregoing evidence, it is apparent that there are a number of significant facts and circumstances from which inferences might legitimately be drawn as to the character of the role played by Gary Owens in the trial of this cause and as to the nature of his relationship in that connection with the plaintiff, Moore. It appears that John Hogg, Sam Brown, and Doc Owens testified to substantially the same story that Gary Owens offered Baxley and Creech $75.00 to testify to; that Hogg and Brown lived on Gary Owens' place and that Doc Owens was Gary Owens' brother; that Gary Owens had talked to Hogg and Brown about the fire; that Hogg had not talked with the plaintiff, Moore, until after he had

talked with Gary Owens; that Gary Owens had come and
got him; that after his talk with Gary Owens, Hogg had
gone to the office of Moore's lawyer; that Gary Owens 'was
working for the plaintiff, Moore, in his gin the week before
the trial; that Doc Owens shortly after the fire had told
a false story about the fire to a representative of the rail-
road; that he had told that 'untruth' and concealed facts
within his knowledge at the request of the plaintiff, Moore;
and that after Moore asked him 'not to say anything about
it,' Gary Owens carried him to Mr. Patterson's office and
'told him not to talk it.' It further appears that Gary Owens
was present at the trial and made an attempt, practically in
the presence of the Court, to get Baxley and Creech to change
their testimony which elicited from the trial Judge the fol-
lowing remark: 'If I had known you were trying to inter-
fere with those witnesses awhile ago, I would have slapped
you in jail before you knew it.' That the foregoing facts
and circumstances are sufficient to warrant the inference
that Gary Owens was an active participant in procuring
witnesses and working up this case against the railroad,
with the knowledge and approval of the plaintiff, would
seem scarcely open to question. If so, in view of the well-
settled legal propositions, that it is competent to show agency
by circumstantial evidence *(Bolton v. Tel. Co.,* 76 S. C.,
531; 57 S. E., 543), that the relation of agency may be
implied from the words and conduct of the parties and
from all the circumstances of the particular case (2 C. J.,
435, § 32), and that where the acts of an alleged agent are
of such a character as to justify an inference that the prin-
cipal knew of them and acquiesced in their commission, the
acts themselves are competent evidence of agency (2 C. J.,
945, § 709), we think there was ample evidence to support
a finding that for the purpose of working up the testimony
and procuring witnesses in this case Gary Owens was the
agent of the plaintiff, Moore. In the light of that setting
of fact, should the evidence as to Gary Owens' attempt to

bribe the witnesses, Baxley and Creech, have been admitted?

"The answer to that inquiry obviously depends upon whether this testimony had any legitimate tendency to cast doubt upon the validity of plaintiffs' claim or to create suspicion as to the trustworthiness of the evidence adduced to establish that claim. That subornation of a witness by a party to a suit, or his attempt to do so, is admissible as evidence tending to establish the falsity or fraudulent nature of his claim upon the theory that it tends to show such party's consciousness of the weakness or injustice of his cause is well settled. 22 C. J., 110, § 52; 10 R. C. L., 885, § 32. *Maynard v. Bailey,* 85 W. Va., 679; 102 S. E., 480; 9 A. L. R., 981. But where the corrupt act is committed not by one of the parties to the suit but by a third person, no general rule or test for the admission of evidence of this nature seems to have found acceptance. In discussing this subject, Prof. Wigmore (Wigmore on Ev. [1st Ed.], § 280), says: 'Where the fraudulent act—bribery, intimidation, spoliation, or the like—has personally been committed by an agent or other third person, and not by the party opponent himself, it is obvious that the act must be brought home to the party's connivance or sanction, express or implied, in order to use it as indicating any consciousness on his part of a weak cause. In thus connecting it with the party, it is to be noted, on the one hand, that no mere technical theory of agency will suffice to charge him; for it is not a question of legal liability, but of actual moral connivance. On the other hand, no less should mere technical deficiencies of proof be allowed to exonerate him; due regard to the common probabilities of experience should be paid. For example, if a witness has been suborned by B., a clerk in the defendant's bank, it is idle to argue that such a clerk has no implied authority to tamper with witnesses, and, therefore, that some conversation or letter of the defendant, expressly authorizing B.'s errand, must be proved. Why should B. meddle in in such fashion, except upon some

hint or order from the defendant? The relation between the two, together with common experience, should suffice to admit the fact, leaving to the defendant the opportunity to exculpate himself, as he easily could if innocent of any share. The common probabilities of such cases cannot be ignored; and it is better to admit such facts in the fair certainty that an innocent party can protect himself, than to exclude them by requiring such a degree of connecting proof as practically gives a general immunity to fraud and chicanery. Most Courts exhibit an undue tenderness for technicality in dealing with such evidence, and shut their eyes, with solemn pretense, to that which every one must believe to be deserving of strong suspicion.'

"In *Nowack v. R. Co.,* 166 N. Y., 433; 60 N. E., 32; 54 L. R. A., 592; 82 Am. St. Rep., 691, the Court said: 'If an honest man by mistake employs a dishonest one to look up witnesses for him, and the latter, through excess of zeal, resorts to bribery, although it was never thought of by his employer, it is better for cleanliness and purity in the administration of justice, that the facts should be shown, with the fullest opportunity for explanation, than to exclude all evidence of the evil acts upon the ground that they were not authorized, because authority may properly be inferred from the nature of the employment. In such a case all doubt should be resolved, if possible, in the interest of clean evidence and the exposure of foul practices.'

"In *Chicago City Railway Co. v. McMahon,* 103 Ill., 485; 42 Am. Rep., 29, working out the solution by the doctrine of scope of employment making the principal liable for malicious acts, it was held by the Illinois Court that 'where a clerk of a railway company is intrusted with the general duty of getting up the evidence for the company in cases where it is sued, without special directions, if he wrongfully and without authority offers money to a witness to suppress or influence his testimony, evidence of that fact is competent against the company.' And see *Snell v. Bray,* 56 Wis., 156;

14 N. W., 14. *McHugh v. McHugh,* 186 Pa., 197; 40 A., 410; 41 L. R. A., 805; 65 Am. St. Rep., 849.

"Conceding that the evidence of the unauthorized act of a third person who makes a corrupt attempt to influence the result of a trial in behalf of one of the parties to a cause has no legitimate probative force to establish such party's moral connivance or sanction of the corrupt act and thus to evidence the party's consciousness of a weak cause, and conceding further that in the absence of express authorization there are technical objections of some cogency to the admission of evidence of the corrupt acts of an agent upon the theory of the liability of a principal or master for acts of the agent or servant within the scope of his employment, we are not prepared to concede that the admissibility of this kind of evidence should be made to turn wholly either upon the moral connivance of the party to the cause or upon bringing the corrupt act of the third person within the scope of his agency or employment. Thus, in the case at bar, the facts and circumstances are amply sufficient to warrant an inference that Gary Owens, who is alleged to have made the attempt to suborn witnesses, knew as much about the facts upon which the validity of the plaintiff, Moore's, fire claim depended as the plaintiff knew himself, and that plaintiff knew of the activities of Gary Owens in procuring witnesses on his behalf and accepted the benefit of the testimony of witnesses procured by Owens, which was substantially identical with the testimony sought to be obtained from Baxley and Creech by bribery. In that situation it is difficult to perceive why an admission by conduct on the part of Gary Owens as to the weakness of the plaintiff's cause would not have as much probative force to cast doubt upon the validity of the plaintiff's claim or to create suspicion of the trustworthiness of the evidence (certainly, of that procured by Gary Owens) adduced to support that claim as if such admission had been made by the plaintiff, Moore, himself. If the probative force of such conduct on

the part of Gary Owens be conceded, then the exclusion of evidence thereof may be justified only upon the theory that the ends of justice would not be promoted by subjecting an innocent party's cause to the suspicion engendered by the unauthorized acts of his agent or henchman. But an innocent party is no more entitled to reap the benefit in a Court of justice of the corrupt practices of others than a party who has personally participated in the corrupt acts. In the aspect of this question here involved the Courts are concerned with the purity of the stream which has been introduced into the channels of justice and not with fixing responsibility for its pollution. If so, and if, as we have seen, the evidence as to the corrupt conduct of Gary Owens has some probative force to create doubt as to the validity of plaintiff's claim and as to the trustworthiness of certain evidence adduced to support it, we are clearly of the opinion that the testimony of Baxley and Creech ought to have been admitted.

"Even in the view that the question of the admissibility of this evidence should turn upon the moral connivance, express or implied, of the plaintiff, Moore, it cannot be held that there were no evidential facts and circumstances from which such connivance could be implied. If resort is had to the 'common probabilities' of such a case, as suggested by Prof. Wigmore, the alleged offer by Gary Owens to pay the sum of $150.00 for testimony needed in another man's lawsuit cannot but be regarded as a most extraordinary proceeding if he expected to pay the money out of his own pocket. The fact that there existed such a relation between the plaintiff and Gary Owens as led to the offer of payment by Owens of a substantial sum of money for testimony in behalf of the plaintiff, taken in connection with the fact that one of the plaintiff's witnesses lied and concealed facts within his knowledge, as he says, at the plaintiff's request, would seem to afford ample basis in common experience for implying the moral connivance of the plaintiff, Moore.

It is an implication from which the plaintiff, Moore, 'in the interest of clean evidence and the exposure of foul practices' (*Nowack v. R. Co., supra*), should have the opportunity of exculpating himself, not by excluding the evidence of the corrupt act, but by proof tending to rebut any implication arising therefrom of his own guilt and any inference of the untrustworthiness of the evidence adduced to support his claim. The appellants' third exception must, therefore, be sustained.

"Appellants' exception 4, directed to the contention that the trial Court erred in refusing defendants' motion for the direction of a verdict upon the ground, in substance, that the evidence was susceptible of no other reasonable inference than that the fire was not communicated by the defendant, railroad's, locomotive engines and did not originate within the right of way, must be overruled. There was evidence which, if believed, was amply sufficient to support a finding that the fire was communicated by sparks from one of the defendant railroad's locomotive engines.

"The judgment of the Circuit Court is reversed and a new trial ordered."

The order of this Court called for a rehearing generally, but the only matter argued before the Court was the appellants' third exception, which related to the exclusion of the testimony of the witnesses Baxley and Creech, offered by the defendants, to the effect that one Owens had attempted to bribe them to give certain testimony on behalf of the plaintiffs in the trial of the cause.

The respondents insist that this Court erred in sustaining that exception, and that the Court overlooked a material matter, set forth in the record, namely, that after the testimony of Baxley and Creech had been offered, one of the attorneys for the railroad company, an appellant here, stated, in substance, that the plaintiff, Moore, was not charged with any wrongdoing, and that he had not been shown

to be connected with the conduct of Owens, who was charged with attempting to secure false testimony in behalf of the plaintiffs.

It appears that after the witnesses, Baxley and Creech, had been offered, Mr. Brown, of counsel for the plaintiffs, requested that the jury be kept together, so there would be no probability of any member of the panel learning of the testimony of Baxley and Creech, which had been taken by the Court in the absence of the jury. To this request, Mr. Harley, leading counsel for the defendants, readily consented, and, in the course of his informing the Court that he did consent, made use of this language:

"I have not charged the plaintiff with one thing. They have not connected him with it, and I have been fair to him in the matter throughout."

Counsel for respondents now urge that, by this statement, the attorney for the appellants admitted that the testimony offered was incompetent, and, because of this admission, that the exception, which was sustained, should now be overruled. A careful reading of the colloquy between the attorneys convinces us that there was no intention on the part of the counsel for the appellants to waive any right of his clients, and that he did not agree to the proposition that the testimony of Baxley and Creech was incompetent. It is true that Baxley and Creech alone had not "connected" the plaintiff, Moore, with the misconduct alleged to have been committed by Owens. Perhaps Mr. Harley, in using the word "they" in his statement, which we have quoted, had reference to Baxley and Creech, and we think this is a reasonable interpretation of his language. But as pointed out in the opinion of Mr. Justice Marion, there were circumstances, related by other witnesses, which might be held to have been evidence that in some way Owens was acting as the agent of the plaintiff, Moore.

Without doubt attorneys engaged in a cause should generally be held to understand and to be bound by statements they make to the Court. We realize, though, that often in the heat of a trial, lawyers, engaged in colloquies, will say things hastily, and there are some instances where they should not be held strictly to the words which they have used. Our Courts must be kept free from false testimony and subornation of such testimony. To that end, this Court should, and will, disregard technicalities, both in the law and in matters of procedure.

A close reading of the record in this case brings to our minds the conviction that the exception formerly sustained by this Court should still be regarded as meritorious, and that there should be a new trial of the cause, in the interest of justice and the rights of all the parties involved. We do not mean to indicate by this holding that either the plaintiff, Mr. Moore, or Mr. Owens, has been guilty of any attempt to secure false testimony. Counsel for respondents assert with great vigor that the plaintiff will be able to answer the insinuations of Baxley and Creech against both Moore and Owens. In justice to these gentlemen, as well as to the defendants, it is our opinion that there should be a new trial of the cause, that both sides may have full opportunity to have these serious charges fully investigated. If the defendants fail to show to the satisfaction of an honest jury that the plaintiff, Moore, sought to bolster up his case by the testimony of false witnesses, unquestionably, the reaction will be greatly to his advantage.

The opinion of Acting Associate Justice Marion, with the addition above set forth, is hereby made the opinion of this Court.

The judgment of this Court is that the judgment below be reversed, and that the cause be remanded for a new trial.

MESSRS. JUSTICES WATTS, COTHRAN and STABLER and MR. ACTING ASSOCIATE JUSTICE C. J. RAMAGE concur.

MR. CHIEF JUSTICE GARY did not participate.